**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STEPHANIE WEDRA, on behalf of  herself and : 
all others similarly situated, :
:
:
Plaintiff, :
:
: Civil Action No.: 7:19-cv-03162-
v. : VB
:
CREE, INC. :
:
Defendant. :
:
:
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CREE, INC.'S**
**MOTION TO STRIKE REPORT AND EXCLUDE OPINIONS OF**
**DR. ANDREAS GROEHN**

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................... 1

III. LEGAL STANDARD ......................................................................................... 3

IV. ARGUMENT ...................................................................................................... 4

    A. Dr. Groehn's report and opinions are pure speculation because he did not conduct or define the survey he proposes. .......................................... 5

    B. Dr. Groehn proposes to test representations that this Court has ruled are not actionable, and that do not exist on Cree's packaging. ............. 6

    C. Dr. Groehn's analysis fails to consider supply-side factors. ........................ 10

    D. Dr. Groehn's analysis assumes bulb failure is certain. ................................ 12

V. CONCLUSION .................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. National R. R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).........................................................................................4

*Apple, Inc. v. Samsung Elecs. Co.*,
    2014 WL 9767898 (N.D. Cal. Mar. 6, 2014)...........................................................6, 10

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993).......................................................................................................4

*Davidson v. Apple*,
    No. 16-CV-04942, 2018 WL 2325426 (N.D. Cal. May 8, 2018)............................14

*Hughes v. The Ester C Company*,
    317 F.R.D. 333 (E.D.N.Y. 2016) ...............................................................................8

*In re Gen. Motors LLC Ignition Switch Litig.*,
    407 F. Supp. 3d 212 (S.D.N.Y. 2019)........................................................................6

*In re General Motors, LLC Ignition Switch Litig.*,
    No. 14-MD-2543, 2019 WL 6827278 (S.D.N.Y. Dec. 12, 2019) ..............10, 11, 12

*In re: Kind LLC Healthy and All Natural Litigation*,
    --- F.R.D. ---, 2021 WL 1132147 (S.D.N.Y. Mar. 24, 2021) .................................12

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) ...............................................................6, 10

*MacDougall v. American Honda Motor Co.*,
    17-1079 (C.D. Cal. Sept. 11, 2020) ......................................................................6, 10

*Mallatier v. Dooney & Bourke, Inc.*,
    525 F.Supp.2d 558 (S.D.N.Y. 2007)..........................................................................7

*Price v. L'Oreal USA, Inc.*,
    17 Civ. 614, 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018) .................................13

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)...............................................................................6, 13

*Townsend v. Monster Beverage Co.*,
    303 F. Supp. 3d 1010 (N.D. Cal. 2018) ..............................................................8, 9

*Twelve Sixty LLC v. Extreme Music Library Ltd.*,
  17-cv-1479, 2020 WL 2749708 (S.D.N.Y. May 26, 2020) ......................................................4

*U.S. v. Williams*,
  506 F.3d 151 (2d Cir. 2007)......................................................................................4, 5

*Weiner v. Snapple Beverage Corp.*,
  07 Civ. 8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ..................................................4, 6

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
  571 F.3d 206 (2d Cir. 2009)......................................................................................4, 5

**Rules**

Fed. R. Evid. 702 ...........................................................................................................4, 14

## I.     INTRODUCTION

Plaintiff's damages expert, Dr. Andreas Groehn, has offered a report that is nothing more than an incomplete explanation of how one might conduct a conjoint analysis in this case.   He did not conduct a pretest to validate his proposed survey, did not reach a determination on a target survey population, did not finalize the attributes he puts forward to test, and, of course, did not conduct a survey-based conjoint analysis.   It appears that he has avoided completing these steps in order to leave his report so nonspecific and flexible that it might evade meaningful critique.   The limited survey description he offers is, however, replete with fatal flaws.   Dr. Groehn (i) proposes testing damages using the "100% satisfaction guarantee" that this Court has already found to be non-actionable puffery (ECF No. 27 at 15), as well as language that does not appear on any Cree bulb package; (ii) impermissibly ignores the supply side of the supply-and-demand interaction in his proposed measurement of price premiums; and (iii) renders a proposed damages methodology that necessarily assumes a 100% failure rate, contrary to the Plaintiff's theory of the case and real-world product performance data.   Accordingly, this Court should exclude Dr. Groehn's report and testimony in their entirety.

## II.    FACTUAL BACKGROUND

Plaintiff retained Dr. Andreas Groehn to determine "determine whether Plaintiffs [sic] and the proposed class members suffered any injury and, if so, to present a damages model showing that their damages can be measured on a class-wide basis."   Expert Report of Andreas Groehn in Support of Plaintiff's Motion for Class Certification dated February 26, 2021 ("Report") ¶ 14; *see also* Transcript of the Deposition of Andreas Groehn dated April

9, 2021 ("Groehn") 53:2-57:16.[1]  In connection with Plaintiff's motion for class certification, Dr. Groehn drafted a report generally describing a consumer survey and conjoint analysis purporting to establish a damages model that, "in the merits phase," could be used "to calculate class wide damages."  Report ¶ 79.

To create his damages model and survey, Groehn identified what he defines as "Longevity Representations" and "Guarantee Representations" based on the allegations in the Complaint and images of Cree lamp packaging.  Report ¶¶ 14, 18-24.   Groehn defines the Longevity Representations to include statements relating to "[t]he lifetime of the lightbulb, including comparison to other lightbulbs."  *Id*. ¶ 20.   Groehn identifies the following specific instances of Longevity Representations: "$140 Lifetime Energy Savings," "$226 lifetime energy savings," and "Our LED bulbs work better and last longer."  Report ¶ 18, Groehn 63:6-66:10.  Groehn defines the Guarantee Representations to include iterations of Cree's warranty language, focusing in particular on iterations of Cree's warranty that include the phrase "100% Satisfaction Guarantee." Report ¶¶ 18-22.

While Groehn describes a hypothetical conjoint survey that he claims could be conducted in this matter, he has not conducted a survey, has not finalized the survey population criteria or survey attributes, and has not conducted a pretest to evaluate the validity or appropriateness of the attributes he proposes testing in a survey.[2] Dr. Groehn generally describes a potential conjoint survey in which a pool of respondents is to select among five hypothetical products, each with different configurations of the same seven

---

[1] Cited excerpts of Dr. Groehn's deposition transcript are attached as Exhibit 1.

[2] Indeed, Dr. Groehn equivocates on whether he intends to conduct a pilot study or pretest at all. Report ¶ 63.

attributes, including variations on the Longevity Representations and Guarantee Representations listed above and price.  See Report ¶ 65, Figure 11.  The survey respondents would then identify which of the hypothetical bulbs they preferred, and indicate whether they would actually purchase the hypothetical product they selected.  *Id.*

As discussed in the Expert Reports of Drs. Jesse David and Joel Steckel (Lindahl Decl., Exs. 9 and 10), respectively, Groehn's hypothetical survey and conjoint analysis suffer from methodological and analytical flaws that render them inadequate for purposes of satisfying predominance under Rule 23.  For example, the use of undefined and overlapping attribute terms; a design that fails to recognize the target population or real-world purchase decisions; failure to include all, or at least all significant, purchase drivers in his attributes list; and unrealistic pricing are all issues that undermine the adequacy of Groehn's damages model.  These problems merit the lengthy treatment they receive in Cree's expert reports setting forth why Groehn's survey cannot be used to satisfy Plaintiff's predominance requirements under Rule 23 and should be given no weight.

Here, however, Cree limits its discussion to Rule 702 admissibility issues: namely, that (i) the fact that Groehn did not design or conduct a survey renders his opinions unreliable and (ii) to the extent Groehn's analysis tests representations that have been excluded in this case or do not appear on Cree's packaging, concerns demand-side factors to the exclusion of supply-side factors, or is premised on a liability theory that deviates from Plaintiff's case, his opinions are irrelevant and unreliable and must be excluded.

## III.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence allows a qualified expert witness to provide opinions only if: (1) the expert's knowledge will help the fact finder understand the issue or

determine a fact in issue; (2) the expert's opinions are based on sufficient data; (3) the expert's methodology in developing his testimony is based on reliable principles and methods; and (4) the expert has reliably applied those principles and methods to the facts of the case.  Fed. R. Evid. 702.  Rule 702 incorporates and codifies the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), which instructs federal courts "to ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Id.* at 589.  Where expert opinions do not have data, principles, methods, a factual basis, or application with a "reliable basis in the knowledge and experience of the relevant discipline," they should be excluded.  *Twelve Sixty LLC v. Extreme Music Library Ltd.,* 17-cv-1479, 2020 WL 2749708 *9 (S.D.N.Y. May 26, 2020) (citing *Daubert*, 509 U.S. at 592 and *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion off that unreliable opinion testimony." *Amorgianos v. National R. R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  The party offering the expert bears the burden of establishing that Rule 702 has been satisfied.  *U.S. v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

## IV.   ARGUMENT

At the class certification stage, an expert must "provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand." *Weiner v. Snapple Beverage Corp.*, 07 Civ. 8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010).  "[A] trial judge should exclude expert testimony if it is speculative or conjectural." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009).  Here, Groehn's report and opinions are unreliable because Groehn

did not conduct a survey or reach a final design for the survey he intends to conduct, rendering his analysis pure speculation, and baked fundamental flaws into the limited description of conjoint analysis he offers.

**A.    Dr. Groehn's report and opinions are pure speculation because he did not conduct or define the survey he proposes.**

At the close of his report, Dr. Groehn concludes that he has presented a methodology that "can be applied in the merits phase to calculate class wide damages."  Report ¶ 79. However, he attempts to afford himself ultimate flexibility to amend that methodology at a later date, stating in the report that his proposed methodology "is flexible and can be modified to incorporate any additional aspects if the Court deems necessary." *Id*.; *see also* Report ¶ 10.  Indeed during his deposition, Dr. Groehn went so far as to say that "[i]f additional data becomes available, [he] might review [his] approach" and use an entirely separate methodology, hedonic pricing, or otherwise adjust "the methodology to be applied for the conjoint analysis."  Groehn 22:15-23:12.  What might prompt Dr. Groehn to change his methodology, and how he might change it, is anyone's guess.

Dr. Groehn's opinions remain so malleable because he did not conduct a pretest or survey, and did not reach a final design of the survey he proposes to conduct.  Report Table 2 is entitled "Description of Attributes To Be Presented to Survey Respondents" and includes 10 attributes with descriptions or choice options.  During his deposition, however, Dr. Groehn acknowledged that he had not made a final determination about which attributes to include his proposed survey, and had not even settled on criteria for his survey population. Groehn 101:16-23; 102:13-103:19.

In its gatekeeping function, a district court has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Williams*,

506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 597).  While an expert is not required to perform a full analysis at the class certification stage, he is required to present a model for determining class wide damages that "actually measure[s] damages that result from the class's asserted theory of injury." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015). Where, as here, an expert has done "nothing more than identify [a] possible [damages approach] and assert [it] will work in this case," he has not presented a sufficiently reliable methodology and his opinion should be excluded.  *Weiner*, 2010 WL 3119452 at *9.

As discussed below, numerous courts in this district and throughout the country have appropriately rejected and excluded conjoint analysis opinions where the experts actually conducted surveys on the basis that conjoint analysis, standing alone, cannot adequately isolate a premium price.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 236 (S.D.N.Y. 2019) ("conjoint analysis does not provide competent proof of Plaintiff's damages"); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015) (same); *Apple, Inc. v. Samsung Elecs*. Co., 2014 WL 9767898 (N.D. Cal. Mar. 6, 2014) (same); *MacDougall v. American Honda Motor Co*., 17-1079 (CD Cal, Sept. 11, 2020) (same).  Dr. Groehn's inchoate conjoint analysis should meet the same fate.

**B.    Dr. Groehn proposes to test representations that this Court has ruled are not actionable, and that do not exist on Cree's packaging.**

In ruling on Cree's motion to dismiss, this Court ruled that Cree's "alleged misrepresentation respecting the 100% guarantee is merely a commendation of the goods, and therefore non-actionable puffery." (ECF 27 at 15).  Dr. Groehn has not read this Court's

motion to dismiss order.  Groehn 71:10-13.[3]  Accordingly, he appears to be unaware that, by proposing to test the impact of the phrase "100% satisfaction guarantee," his damages model is designed to test non-actionable language that cannot form the basis of damages in this case.[4]  His analysis should be excluded on that basis.  *Mallatier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 572 (S.D.N.Y. 2007) (expert testimony concerning unrecoverable damages did not fit the facts of the case and was therefore excluded).

Even if damages were available for the "100% satisfaction guarantee" statement – and they are not – Dr. Groehn's proposed methodology to test packaging language should still be rejected because he seeks to test language that fundamentally departs from the language on Cree's packaging.  Dr. Groehn included in his report images of Cree lamp packaging and testified that he reviewed multiple iterations and generations of packaging that included variation in packaging statements over time.  Groehn 79:20-80:15.   Further, Dr. Groehn testified that "it is important that respondents get [] information as it was provided by Cree on the packaging."   Groehn 86:3-5.   Notwithstanding his review of packaging and recognition of the importance of respondents viewing information as it appeared on packaging, Dr. Groehn crafted statements to be included in his survey that are either so truncated that they alter the meaning of packaging language or do not appear on Cree packaging at all.

For the Guarantee Representation, Dr. Groehn proposes to test the following three

---

[3] Q: Did you review, for example, the Court's decision on the motion to dismiss in this case? A: Motion to dismiss in this case, I don't think so.

[4] *See* Groehn 82:15-83:4 (describing an approach to measure the impact of "100% satisfaction guarantee").

attribute levels:

      1. 10 years with original receipt and packaging

      2. 10-year 100% satisfaction guarantee

      3. 100% satisfaction guarantee

      Report Table 2.

During his deposition Dr. Groehn acknowledged that none of these warranty survey choice options reflects the full warranty statements appearing on Cree's packaging. Groehn 83:13-84:11.

Further, for both the "Better Statement" and the "Lifetime Savings Over Incandescent Bulbs" statement, Dr. Groehn proposes to test—rather than multiple choice levels—either a packaging representation or the word "Blank." Report Table 2; Figure 11. While the word "Blank" appears in Dr. Groehn's sample survey choice screen, he testified that he has not yet decided whether to include the word "Blank" or to leave the survey choice box empty. Groehn 124:19-125:2.

Groehn's proposal to test language that does not appear on Cree packaging renders his opinion irrelevant and unreliable. Courts appropriately reject conjoint analyses in analogous cases where they test language that putative class members could not have seen. *Townsend v. Monster Beverage Co.*, 303 F. Supp. 3d 1010 (N.D. Cal. 2018); *Hughes v. The Ester C Company*, 317 F.R.D. 333, 355 (E.D.N.Y. 2016). In *Townsend*, the conjoint expert was Dr. Groehn's colleague Stephan Boedeker, the same expert Dr. Groehn assisted for the *Young v. Cree* case. Mr. Boedeker's opinions in *Townsend* case were excluded as irrelevant and unreliable. *Townsend*, 303 F. Supp. 3d at 1024. In pertinent part, the plaintiffs hired Boedeker to "develop an economic loss model to quantify the damages, if any, suffered by

the proposed class" attributable to the "misstatements at issue." *Id.* at 1019. Of the four statements at issue in the case, however, Boedeker included only one statement from the Monster Energy labels. *Id.* at 1020. For the rest, Boedeker: (i) omitted the second half of a statement; (ii) added four words to a one-word statement; (iii) omitted the content of a statement but summarized it as "safe level of consumption incorrectly specified on label" or "safe level of consumption correctly specified on label"; and (iv) added a new statement—not present on the actual label—to his survey. *See id.* Through a conjoint analysis based on these statements, Boedeker opined on how much less money survey respondents would have paid for a drink with none of the attributes targeted by the statements. *Id.*

Considering the defendants' motion to strike Mr. Boedeker's analysis, the court reasoned that "[t]he exact wording of each statement is [] critical" because "the exact words matter in false advertising claims." *Id.* at 1023-24. Accordingly, just as in this case, for the conjoint analysis to be relevant and reliable, "the words he [was] evaluating must in fact be the words on Defendants' labels." *Id.* at 1023. Because the *Townsend* conjoint analysis deviated from the real-world packaging statements, just as Groehn's proposed attribute language does in this case, it was excluded. *Id.* at 1024.

As in *Townsend*, Groehn purports to assess economic damages in a case that the Plaintiff concedes is about alleged misrepresentations, but each of the attributes he proposes to test include language that does not appear Cree packaging. As the court concluded in *Townsend*, "the exact wording of each statement" is "critical," and the words an expert chooses to evaluate consumer reactions to representations "must in fact be the words on [the defendant's] label." *Id.* at 1023. Under *Townsend* and Rule 702, Groehn's analysis based on statements that do not appear on Cree packages is irrelevant and unreliable and should be

excluded.

### C. Dr. Groehn's analysis fails to consider supply-side factors.

Dr. Groehn's conjoint analysis aims to demonstrate a method that can quantify the alleged "price premium" Cree purportedly commands as a result of the tested packaging claims. But as set forth in Dr. Jesse David's rebuttal expert report, Dr. Groehn's conjoint analysis cannot provide evidence of how the seller or its competitors would react to the removal of a particular label claim—in other words, the supply side of the market. (David Report ¶¶ 34-36.) "[T]he but-for price, similar to the actual price, is a consequence of market equilibrium that results from the interaction of both supply and demand." *Id*. ¶ 28 Accordingly, "[t]o determine the price premium, the economist must necessarily estimate the but-for price that results from this interaction of supply and demand in a properly defined but-for world." *Id*. Courts in this district and around the country regularly reject conjoint analyses due to their failure to account for the supply side of the supply-and-demand interaction. *In re General Motors, LLC Ignition Switch Litig.*, No. 14-MD-2543, 2019 WL 6827278 at *8 (S.D.N.Y. Dec. 12, 2019). See also *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015) (same); *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 9767898 (N.D. Cal. Mar. 6, 2014) (same); *MacDougall v. American Honda Motor Co.*, 17-1079 (CD Cal, Sept. 11, 2020) (same). Dr. Groehn's proposed analysis in this case should similarly be rejected.

As with *Townsend* case, Dr. Groehn's colleague Mr. Boedeker was faulted for this very mistake in *General Motors*. There, a putative class action brought on behalf of GM car owners whose vehicles were subject to recalls, this Court addressed GM's motion for summary judgment and concluded that Mr. Boedeker's conjoint analysis "was insufficient as a matter of law to support a claim for diminution-in-value damages" under the law of the

states at issue because it "focuse[d] entirely on consumers' willingness to pay and ignores producers' willingness to sell." *In re General Motors,* 2019 WL 6827278 at *6. On the plaintiffs' motion for reconsideration, the court again concluded that Mr. Boedeker's conjoint analysis "is insufficient evidence of market price because it entirely neglects the supply curve." *Id.* at *9. The *General Motors* court thus concluded that Mr. Boedeker's conjoint analysis was "insufficient as a matter of law to support the essential element of damages" because, by ignoring supply-side factors, his analysis "reimagin[es] sellers as conscripted to produce and sell their products at whatever price consumers are willing to pay." *Id.* at *11 (citing *In re My Ford Touch Consumer Litig.*, 291 F. Supp. 3d 936, 970 (N.D. Cal. 2018)).

Consistent with the faulty conjoint analysis in *General Motors*, Dr. Groehn's analysis fails to take into account supply-side factors. Dr. Groehn attempts unsuccessfully to sidestep this fundamental flaw in his analysis. He states in Report Paragraph 26 that "we need to understand demand and supply… in the actual world, … and in the hypothetical but-for world," but then in Paragraph 32 states that the supply curve in his hypothetical but-for world is "irrelevant." Report ¶ 32. As Dr. David aptly states:

> It is true that if you ignore the supply side of a market entirely, as [Groehn] does, then it does become irrelevant to the exercise, but Dr. Groehn's exercise in the first place—shifting the but-for demand curve vertically—has nothing to do with determining harm to consumers. The shape of the supply curve and market equilibrium in the but-for world are certainly not irrelevant to determining what the price would have been but-for the alleged misrepresentations, the critical step in determining harm to consumers. David Report ¶ 35.

In his deposition, Dr. Groehn acknowledged that multiple factors unrelated to packaging representations may drive Cree's pricing decisions, such as competitors' pricing,

and that regardless of the representations on a product, a manufacturer may keep price constant.  Groehn 96:13-20; 97:8-15.  This is consistent with Dr. David's finding that, in actuality, Cree sets its pricing based on competitors' pricing, Cree's costs to manufacture products, and negotiations with retailers, and that accordingly "there is no reason to expect that changes to the specific wording on the packages of Cree's LED lightbulb products would lead to any change in the prices that Cree or the retailers set for the Accused Products." David Report ¶ 54.

Notwithstanding Dr. Groehn's recognition of this reality, his proposed analysis necessarily assumes to the contrary that Cree and other market participants will sell their LED bulbs at whatever price the consumer is willing to pay, and will vary those prices based on packaging statements.  In other words, he assumes—incorrectly—that in a but-for world Cree and its competitors would adjust pricing without regard to manufacturing cost, profit margin, and competitive pricing, among other supply side factors. *See In re General Motors*, 2019 WL 6827278 at *11.  District courts in the Second Circuit are appropriately skeptical of permitting a conjoint analysis, standing alone, as the only method of assessing damages in a case.  *See In re: Kind LLC Healthy and All Natural Litigation*, --- F.R.D. ---, 2021 WL 1132147 at *16 (S.D.N.Y. Mar. 24, 2021)("It is worth noting that courts are split as to whether a conjoint analysis on its own can adequately isolate a premium," and noting that because the expert in that case used multiple damages methods the "Court need not wade into the debate over reliability of conjoint analysis.") Because Dr. Groehn willfully ignores the realities of supply side economics, his proposed measure of damages is fundamentally unreliable and this Court should exclude it.

**D.** **Dr. Groehn's analysis assumes bulb failure is certain.**

Under controlling precedent, "a model for determining classwide damages relied upon

12

to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).  Dr. Groehn has failed this requirement because he explicitly assumes a 100% bulb failure rate, which is contrary to reality and to Plaintiff's theory of the case.

In her motion for class certification, Plaintiff states that her technical expert Dr. Allen opines that Cree's bulbs "***are prone to*** a shortened lifespan and premature, catastrophic failure," but <u>not</u> that all Cree bulbs will uniformly fail in advance of their stated lifetimes. (ECF 65 at 11).  In reality, Cree's return rate—in the industry, a proxy for failure rate—is under 2%.  Declaration of Scott Schwab ¶¶ 31, 63; Primato Decl. ¶ 19.  Contrary to Plaintiff's recognition that not all Cree bulbs fail prematurely, and real-world data illustrating low failure rates, the entire premise of Groehn's opinion is that each bulb a consumer purchases will fail before it reaches the lifespan reflected or indicated on Cree's packaging.  In other words, Groehn assumes a premature failure rate of 100% for every one of Cree's consumer lightbulbs.[5]

Dr. Groehn testified specifically that his hypothesis is that all consumers would have been harmed.  Groehn 59:23-60:1.  Groehn admits that his analysis does not, and is not intended to, reflect Plaintiff's case:  "And so all purchases have been – would have been harmed, assuming that these claims that defendants made were false and material."  Groehn 57:7-12.  But to be relevant—and admissible—Groehn's analysis must be tied to the reality

---

[5] The discrepancy between Plaintiff's theory of the case and Groehn's false 100% failure assumption make this case fundamentally different from *Price v. L'Oreal USA, Inc.*, 17 Civ. 614, 2018 WL 3869896 at *10 (S.D.N.Y. Aug. 15, 2018) in which a conjoint survey was permitted because the expert's analysis fit directly with Plaintiff's theory of liability.

of Plaintiff's case. *See Roach*, 778 F.3d at 407. Groehn's analysis is thus simply not relevant to the real-world circumstances of Plaintiff's case. It should therefore be excluded under Rule 702.

Again, Groehn's colleague Mr. Boedeker has had experience with this particular problem. In *Davidson v. Apple*, No. 16-CV-04942, 2018 WL 2325426 (N.D. Cal. May 8, 2018), the plaintiffs theorized that Apple "failed to disclose the touchscreen defect in the iPhone 6 and 6 Plus, causing consumers to pay more for those products than they otherwise would have." *Id.* at *21. To support this theory, Boedeker conducted a survey and asked respondents "to choose between hypothetical phones that differed in storage capacity[;] talk time[;] price[;] and defectiveness." *Id*. He then "isolated the (negative) value associated with defectiveness." *Id.*

The *Davidson* court agreed with Apple that Boedeker's methodology was "fatally flawed" because it "assume[d] that the touchscreen defect will manifest in all iPhones." *Id.* at *22. Specifically, the plaintiffs asserted that "Apple failed to disclose the existence of a touchscreen defect that manifests in approximately 5.6 percent of the iPhone 6 Plus (after two years of use) and at a somewhat lower rate for the iPhone 6." *Id*. The court thus reasoned that Boedeker's damages model "should measure how much consumers overpaid for iPhones assuming a roughly 5.6 percent or less chance that consumers would experience the touchscreen defect" but instead, it assumed a touchscreen defect that "is certain to manifest in all iPhones." *Id*. The court therefore held that the proposed damages model was inadequate. *Id.* at *24. Likewise, this Court should find that, because Groehn's 100% failure assumption is contrary to Plaintiff's theory of the case and to reality, his opinions should be rejected.

14

## V.    CONCLUSION

For the foregoing reasons, Cree respectfully requests that the Court exclude Mr. Groehn's report and testimony.

Dated: April 30, 2021
        Charlotte, North Carolina

                                        Respectfully submitted,

                                        **KATTEN MUCHIN ROSENMAN LLP**
                                        By:  */s/ Rebecca K. Lindahl*

                                        Craig A. Convissar
                                        575 Madison Avenue
                                        New York, NY 10022
                                        craig.convissar@katten.com
                                        Ph: 212-940-6369
                                        Fax: 212-940-8776

                                        Stuart M. Richter (admitted *pro hac vice*)
                                        2029 Century Park East, Suite 2600
                                        Los Angeles, CA 90067-3012
                                        stuart.richter@katten.com
                                        Ph: 310-788-4400
                                        Fax: 310-712-8434

                                        Rebecca K. Lindahl (admitted *pro hac vice*)
                                        550 S. Tryon Street, Suite 2900
                                        Charlotte, NC 28202
                                        rebecca.lindahl@katten.com
                                        Ph.: 704-344-3141
                                        Fax: 704-344-2277

                                        Charles A. DeVore (admitted *pro hac vice*)
                                        525 West Monroe Street
                                        Chicago, IL 60661
                                        charles.devore@katten.com
                                        Ph: 312-902-5478
                                        Fax: 312-902-1061

                                        *Attorneys for Defendant Cree, Inc.*