**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— x
                                                  :

STEPHANIE WEDRA, individually on behalf of:
herself and on behalf of all others similarly situated, :    Civil Action No. 7:19-cv-03162-VB
                                                  :
            Plaintiff,                    :
v.                                                :
CREE, Inc.,                               :
            Defendant.             :
                                                    :
                                                    :
                                                    :
——————————————————————— x

### **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF OPINION DENYING CLASS CERTIFICATION**

# <u>TABLE OF CONTENTS</u>

Table of Contents……………………………………………………………………………i

I.      PRELIMINARY STATEMENT………………………………………………...1

II.     ARGUMENT………………………………………………………………......2

     A.  Plaintiff sufficiently identified a common defect among the LED Lamps at issue in this case…………………………………………………………………...2

         i.     *The Allen Report identified a common defect among Defendant's products……………………………………………………………………2*

         ii.    *The Court's decision to disregard Dr. Allen's opinion was incorrect…...3*

         iii.   *Plaintiff has offered far more detail than the litigants in the matters Cited in the Court's Opinion………………………………………………6*

     B.  This Court overlooked the extensive independent CPUC testing which strongly supports and underlies Dr. Allen's opinions……………………………7

III.    CONCLUSION……………………………………………………………..8

i

# I.

## PRELIMINARY STATEMENT

Plaintiff Stephanie Wedra, individually on behalf of herself and on behalf of all others similarly situated ("Plaintiff"), respectfully submits this memorandum of law requesting that this Court reconsider its Opinion and Order dated June 13, 2022 ("Opinion"),[1] insofar as it denied Plaintiff's Motion for Class Certification ("Plaintiff's Motion").

This Court denied Plaintiff's Motion based on the finding that she failed to satisfy her burden to demonstrate predominance as required by Rule 23(b)(3). Specifically, the Court agreed with Defendant's argument that "common issues do not predominate because plaintiff has failed to identify a common defect among the at-issue lightbulbs."[2] Plaintiff asks this Court to reconsider the Opinion for two reasons.

*First*, Plaintiff did, in fact, identify a common defect among the lightbulbs at issue in this case through the report of her expert Dr. Gary R. Allen (the "Allen Report"). In his report, Dr. Allen concluded that the lightbulbs are defective because they "operate too hot." Though this Court found the opinions expressed in the Allen Report to be "too speculative."[3] Plaintiff respectfully contends that, in reaching this conclusion, this Court misconstrued several aspects of the Allen Report.

*Second*, the Court failed to consider Dr. Allen's foundational reliance upon, *inter alia*, the extensive independent testing conducted by the California Public Utilities Commission ("CPUC Testing"). Plaintiff respectfully submits that had this Court considered the extent to which Dr.

---

[1] A true and accurate copy of the Opinion (ECF 118) is annexed hereto as Exhibit A.

[2] Opinion at pg. 10.

[3] Opinion at pg. 13.

Allen's opinions are founded upon and buttressed by the CPUC Testing, this Court would not have concluded that Dr. Allen's opinions are speculative.

Based on the foregoing, Plaintiff respectfully requests that this Court reconsider its opinion and, upon reconsideration, grant Plaintiff's Motion for Class Certification.

## II.

## ARGUMENT

When a party moves to reconsider a decision by the Court, "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."[4] As detailed below, Plaintiff respectfully contends that this Court overlooked data and opinions contained in the Allen Report and summarized in Plaintiff's briefing when the Court issued its Opinion denying Plaintiff's Motion.

**A. Plaintiff sufficiently identified a common defect among the LED Lamps at issue in this case.**

When a party bases misrepresentation claims upon the defective design of a product, whether the defective design "is susceptible to classwide evidence is dispositive of whether Plaintiffs can satisfy predominance."[5] Here, the defective design in question concerns the temperatures at which the Cree LED Lamps operate.

*i.* ***The Allen Report identified a common defect among Defendant's products.***

According to Dr. Allen, "[t]he Cree LED Lamps share a common defect – they operate too hot, i.e., the operating temperature is too high, and because of this will experience premature, catastrophic failure at a quantifiable failure rate of 4x to 16x faster than the specified 25,000-hour

---

[4] *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995).

[5] *Gonzalez v. Owens Corning*, 885 F.3d 186, 196 (3d Cir. 2018).

operating lifetime, i.e., about 1,500 hours to about 6,000 hours of operating time."[6] Dr. Allen reaches this opinion based upon "publications of third-party testing of Cree LED Lamps ("CPUC Testing"), [his] own testing ("Allen Testing"), Cree's In House Testing Data, and on published IES Standards and Guidelines for testing LEDs and LED Lamps, as well as Engineering Best Practices related to Design for Reliability of electronic products."[7]

Dr. Allen provides a detailed and highly technical explanation for why and how these lightbulbs are defective. As detailed in the Allen Report, the 30 Cree LED Lamps which appear in Table 2 therein are all encompassed within "4 Cree LED Lamp Architectures."[8] In his report, Dr. Allen attributes the operating temperatures for each of the four Cree LED Lamp Architectures to a poorly designed "heat sink."[9]

### ii.    The Court's decision to disregard Dr. Allen's opinion was incorrect.

This Court discounted Dr. Allen's opinion and concluded that the Allen Report "fails on its face to suggest that classwide evidence will answer whether there is a common defect."[10] However, this conclusion is based on an incorrect reading of the section of the Allen Report concerning his temperature testing. In the Opinion, this Court stated that "Dr. Allen admits that only some of the components in some of the bulbs he tested recorded temperatures that exceeded the Target Maximums."[11] While technically true, each instance where temperature measurements failed to exceed Target Maximums occurred in testing in 25ºC ambient air. Yet, packaging for the

---

[6] *See* Allen Report (ECF 100-2), annexed hereto as Exhibit B, at pg. 3.

[7] Allen Report at pg. 3.

[8] Allen Report at pg. 66.

[9] Allen Report at pg. 3-4.

[10] Opinion at pg. 12.

[11] Opinion at pg. 12.

lamp designs in question stated that they were suitable for operating environments up to 45ºC.[12] In each case where measurements were below Target Maximums at in 25ºC ambient air, Dr. Allen was able to extrapolate that Target Maximums would be exceeded at 45ºC (a temperature Cree advertises as suitable for its products).[13] Thus, Dr. Allen's testing *confirms* that the Cree LED Lamps operate at too hot a temperature and the results cited by the Court are not contradictory in any way.

Next, the Court takes issue with what it describes as "potential issues that could be associated with the longevity of some of the tested lightbulbs, but not others."[14] However, the issues identified by the Court are, simply, Dr. Allen's explanation as to the manner in which the heat sink in each of the four Cree LED Lamp Architectures is defective. The fact remains that all of the four Cree LED Lamp Architectures are experiencing overheating due to a defective heat sink. The existence of minor differences between the architecture designs does not mean that individual issues predominate over class-wide concerns. Indeed, Dr. Allen opined that "[a]ll of the Cree LED Lamps, although differing in appearance, share similar internal components such that he is able to make a common conclusion as to (1) whether they are experiencing failure in advance of the advertised product life and (2) whether that failure is common across the LED Lamps."[15]

---

[12] Allen Report at pp. 42-44.

[13] *See* Allen Report at pg. 43 ("FT6 LED Lamp operates with Tj = 92 - 94 ºC in 25 ºC ambient air (my data and Cree data) which is cooler than the Target Maximum by only about 10 ºC *but would exceed the Target Maximum by about 10 ºC when operating in 45 ºC ambient*"); ("4F10 LED Lamp operates with Tj = 95 ºC in 25 ºC ambient air (my data and Cree data) which is cooler than the Target Maximum by only about 10 ºC *and would exceed the Target Maximum by about 10 ºC when operating in 45 ºC ambient*"); *see* Allen Report at pg. 44 ("the FT18/3w, FT9.5, 4F10, and BR9 Cree LED Lamp Designs are all within only 5 oC of the Target Maximum for the Electrolytic Capacitor used in each lamp in 25 ºC ambient air, *and all exceed the Target Maximum by about 15 - 20 ºC when operating in 45 ºC ambient*).

[14] Opinion at pp. 12-13.

[15] Allen Report at pg. 3.

4

The Sixth Circuit opinion in *Glazer v. Whirlpool* is instructive. In that matter, Whirlpool sought to defeat class certification based on the argument that the products in question were "built over a period of years on two different platforms, resulting in the production of twenty-one different models during the relevant time frame."[16] The Court rejected this argument based on plaintiff's evidence showing that "the two platforms are nearly identical, the design issues concerned various models, and most of the differences in models were related to aesthetics, not design."[17]

In this matter, Dr. Allen has similarly been able to distill 30 lamp designs into four different Cree Lamp Design Architectures.[18] In addition, Dr. Allen has offered his opinion that "the 30 lamp designs include several cosmetic differences and minor variations within their respective designs" and that this "does not alter [his] conclusion that they share a common defect."[19] As such, the perceived differences between the designs of the lightbulbs in question do not serve as a barrier to class certification.

Finally, this Court noted that Dr. Allen identified several potential issues which can cause catastrophic failure without any overheating.[20] However, Dr. Allen opined that "except in cases of a fundamentally poor material choice, or a systemic manufacturing defect, such failure mechanisms in LED Lamps are not as likely to cause endemic early failures as are high

---

[16] *Glazer v. Whirlpool Corp.* (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.), 722 F.3d 838, 854 (6th Cir. 2013).

[17] *Id*.

[18] Allen Report at pg. 65 (""None of the 30 Cree LED Lamps listed in Table 2 can be distinguished from its corresponding one of the four Cree LED Lamp Architecture Lamps as tested based on mechanical, thermal or optical components.").

[19] Allen Report at pg. 64.

[20] Opinion at pg. 13 (citing Allen Report at pg. 30).

temperatures."[21] As such, he was able to conclude that it is "high temperatures, and not these other potential failure mechanisms, that causes the LED Lamps to fail."[22] Thus, Dr. Allen has not, in any way, suggested, let alone opined, that these other issues are to blame for the failure of Cree's products. While Cree may contend that product failures are due to an issue other than a defective heat sink, that inquiry goes to the merits of Plaintiff's claim and "does not overlap with the predominance test."[23]

### iii.  Plaintiff has offered far more detail than the litigants in the matters cited in the Court's Opinion.

The Court's Opinion cites to several cases to support the conclusion that Plaintiff failed to adequately identify a common defect in this matter. However, Plaintiff has provided far more detail concerning the common defect present in this matter than did the litigants in the matters cited by the Court.  *Gonzalez v. Owens Corning* involved 23 different types of allegedly defective shingles were designed according to 500 different specifications.[24] The Court found that plaintiff did not identify a common defect after plaintiff in that case admitted "that a significant proportion of Oakridge shingles may in fact last the length of their warranties, *i.e.*, lack any defect."[25] In *Wang v. Tesla*, the plaintiff failed to "even specify what kind of defect was at issue on a class-wide basis."[26]

---

[21] Allen Report at pg. 30.

[22] Allen Report at pg. 30.

[23] *Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1173 (9th Cir. 2010) (Defendant argued that "the evidence will demonstrate that the prospective class members' vehicles do not suffer from a common defect, but rather, from tire wear due to individual factors such as driving habits and weather."  The Court determined that defendant's argument amounted to an inquiry into "whether class members can win on the merits.").

[24] *Gonzalez* 885 F.3d at 196.

[25] *Id*.

[26] *Wang v. Tesla, Inc*., 338 F.R.D. 428, 442 (E.D.N.Y. 2021).

Unlike the plaintiffs in *Gonzalez* and *Wang*, Plaintiff herein has specifically, and in great detail, identified the defect common to the proposed class.  These cases do not support the conclusion that Plaintiff has failed to establish predominance. Accordingly, this Court should grant reconsideration.

**B. This Court overlooked the extensive independent CPUC testing which strongly supports and underlies Dr. Allen's opinions.**

Reconsideration is also appropriate here because it appears this Court failed to consider the CPUC Testing, heavily referenced in the Allen Report, when it rendered its Opinion denying Plaintiff's Motion. The Allen Report makes clear that the opinions expressed therein are supported by CPUC Testing.[27] The CPUC and its exhaustive testing are not mentioned in the Opinion.

According to the Allen Report, the "CPUC test is the most comprehensive and rigorous test to date to quantify the realistic expected lifetime and failure modes of LED Lamps in consumer applications."[28] The CPUC Testing cost $500,000.00 and was conducted over the course of 1.5 years, including 13 months of testing.[29] It resulted in a 137-page report published by the CPUC on October 15, 2017.[30]  As detailed by Dr. Allen, the CPUC Testing rigorously adhered to industry standard testing protocols.[31] Dr. Allen confirmed the relevance of the CPUC Testing to this matter and attested that "it is exactly equivalent to a test that [he] would execute in support of this case if [he] were allocated the 1.5 year elapsed time required."[32]

---

[27] *See* Allen Report at pg. 3 (identifying CPUC Testing as a source of his opinions).

[28] Allen Report at pg. 10.

[29] *See* Allen Report at pg. 10.

[30] *See* Allen Report at pg. 10.

[31] *See* Allen Report at pp. 10-15.

[32] Allen Report at pg. 24.

The CPUC Testing is relevant to this case for several reasons. Preliminarily, according to Dr. Allen, the testing showed that "Cree lamps failed more often than any other manufacturer's lamps."[33] More importantly, the CPUC Testing validated Dr. Allen's selection of 105ºC as the Target Maximum Temperature for his testing.[34] This is particularly impactful because, in determining that Dr. Allen's conclusions were "too speculative," this Court noted that it was "dubious" of Dr. Allen's methodology for "determining the 'Target Maximum' temperatures."[35]

Plaintiff respectfully contends that if this Court had fully considered the extraordinarily extensive CPUC Testing (which Dr. Allen analyzed in great detail in his report) and its validation of Dr. Allen's methodology, it would not have determined that Dr. Allen's opinions were too speculative and, in turn, would have granted Plaintiff's Motion for Class Certification.

## III.

## CONCLUSION

The Allen Report begins by clearly stating that "The Cree LED Lamps share a common defect" and specifically identifies that defect as the heat sink for each and every one of the four basic designs.[36] Dr. Allen never strays from this conclusion and his report goes into great detail about why and how the heat sinks are defective, and the impact of excessive heat on these bulbs. This is the common, predominating issue in this case. Each of the relevant bulbs, which this Court has already determined are part of an ascertainable class, contain one of these heat sinks. If the Plaintiffs are successful, or even if they are not, a trial on the merits which presents the evidence of this singular design flaw will be a binding class-wide resolution of the claims presented by the

---

[33] Allen Report at pg. 5.

[34] *See* Allen Report at pp. 5, 71.

[35] Opinion at pg. 12, fn. 7.

[36] *See* Allen Report at pp. 3-4.

Plaintiffs in this litigation. Based on the foregoing and the entire record, Plaintiff respectfully requests that the Court grant reconsideration and, upon doing so, grant Plaintiff's Motion and certify the proposed Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

Dated: June 27, 2022                                 Respectfully submitted,

**THE SULTZER LAW GROUP, P.C.**

By: _/s/ Jason P. Sultzer_____
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Mindy Dolgoff, Esq.
270 Madison Avenue, Suite 1800
New York, NY 10016
Phone: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
dolgoffm@thesultzerlawgroup.com

Michael A. McShane
S. Clinton Woods
Ling Y. Kuang
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
Phone: (415) 568-2555
Fax: (415) 568-2556
mmcshane@audetlaw.com
cwoods@audetlaw.com
lkuang@audetlaw.com

Melissa S. Weiner
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pswlaw.com

9

Charles J. LaDuca
Alexandra C. Warren
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
charles@cuneolaw.com
awarren@cuneolaw.com


Charles E. Schaffer
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
cschaffer@lfsblaw.com

*Attorneys for Plaintiff*